SPENCER et al.

v.

McGILL et al., Appellants;

Diversified Equities et al.; Thompson, Hine & Flory, Appellee.

[Cite as *Spencer v. McGill* (1993), 87 Ohio App.3d 267.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64215

Decided April 19, 1993.

*Cavitch, Familo & Durkin Co., L.P.A., Michael C. Cohan* and *Karen L. Giffen,* for appellants.

*Thompson, Hine & Flory, David L. Parham* and *Karen E. Rubin,* for appellee.

*Per Curiam.*

Third-party plaintiffs John McGill ("McGill"), Telecommunications, Inc. ("TCI") and Complexicable of Brecksville ("appellants") appeal from the following trial court orders, *viz.* (1) an order granting summary judgment for third-party defendant, the law firm of Thompson, Hine & Flory ("TH & F" or "appellee") and (2) an order pursuant to Civ.R. 54(B) making the entry of summary judgment for appellee final. The relevant facts follow.

Beginning in July 1983, appellants McGill and TCI retained TH & F, appellee, to assist in the formation of appellant Complexicable, a new company which would operate a cable television system in Brecksville, Ohio. Complexicable was organized as a limited partnership. McGill and TCI were general partners, but a certain number of limited partnerships, known as "units," were also available. Complexicable was to be partially financed through the sale of these units to investors. A business entity called Diversified Equities acted as the administrative agent in selling Complexicable units. Diversified Equities was represented by James Schoff, who bought two units.

Appellee drafted, *inter alia,* a partnership agreement for Complexicable. In September 1983, an initial Certificate of Limited Partnership was filed in the office of the Cuyahoga County Recorder.[1] Thereafter, in December 1983, an "Amended and Restated Agreement and Certificate of Limited Partnership" ("Amended Agreement") was filed in the office of the Cuyahoga County Record-

---

1. This information is stated in the "Amended and Restated Agreement and Certificate of Limited Partnership," a copy of which was attached to the original complaint in the case *sub judice.*

er. Article IV, Section 4.1(b)(i) and (ii) of the restated agreement (the "payout provision") provided the following:

## "ARTICLE IV

## "PROFIT AND LOSS; CASH FLOW AND OTHER DISTRIBUTIONS; ACCOUNTING

"Section 4.1 Allocation of Profit, Gain, Loss, and Tax Credit.

" * * *

"(b) In the event of a sale, transfer, or other disposition of all or substantially all of the assets of the Partnership, taxable gain shall be allocated among the Partners in the following order:

"(i) each Partner shall be allocated the *amount of gain needed,* if any, to increase his capital account *to an amount equal to 150% of his total capital contributions* actually made to the Partnership * * *; and

"(ii) thereafter, 50% of the gain shall be allocated among the Class A Limited Partners in the proportion which the number of Class A Limited Partnership Units owned by each bears to the total of Class A Limited Partnership Units owned by all Class A Limited Partners, 40% of the gain shall be allocated to or among the Class B Limited Partner(s) and *10% of the gain shall be allocated equally between the General Partners."* (Emphasis added.)

By the end of December 1983 all of the limited partnership units in Complexicable had been sold. In March 1984, all of appellee's various services in connection with the Complexicable transaction were completed.

In 1987, appellants notified the limited partners of Complexicable that an offer to buy the assets of the partnership had been made. Approval for the sale was sought from all the partners and was thereafter obtained.

In October 1988, however, a dispute arose between appellants and Schoff concerning computation of the payment of capital contributions to the partners. Specifically, appellant McGill proposed to distribute to limited partners one hundred percent of their capital contributions, whereas Schoff asserted the sale of Complexicable's assets provided sufficient gain to fund one-hundred-fifty-percent allocations as provided in the payout provision, Article IV, Section 4.1(b)(i) of the Amended Agreement.

On October 25, 1988, Schoff wrote appellant McGill a letter which stated in pertinent part as follows:

"I received your letter of October 14, 1988, but unfortunately it failed to shed any new light on the Brecksville distributions. You indicated during our telephone conversation that I need only to direct you to a single reference to the

allocation provision (150% of original capital before a 50/50 split) in the Partnership Agreement to convince you to follow its format. I pointed out the Terminal Value Computation in the Offering Prospectus (January 1, 1990) as reaffirming that split; however, while *you indicate that Rich's recollection was that the Class A Limited Partners receive only the return of their original capital* as a priority, if you do the arithmetic, the 'net sales proceeds per Limited Investor Unit' of $53,906, $63,500 and $73,171 (depending on cap rate) compute accurately only if you return 150% of original capital before you split on the 50/40/10 basis.

" \* \* \*

"If you only return 100% of the original capital contributions, *the Class A Limited Partners would (and did) only receive a total of $2,457,104 which is $210,000 less than you recited in your December [1987] letter.*

" \* \* \*

"*There is, of course, a 'story' concerning the derivation of the 150% priority allocation and it is difficult to understand why you would have no recollection of any discussion concerning this provision.* \* \* \* *[Y]our implication that this provision was 'substituted' without your knowledge by Thompson, Hine & Flory defies the facts.* \* \* \* *[I]n this instance, the language of the Brecksville Partnership Agreement is unambiguous and specific* \* \* \*.

" \* \* \*

" \* \* \* [I]t is difficult to understand why, even if you disagree with everything else I have said, you would not choose to give the Limited Partners 'the benefit of the doubt' by allocating 150% of their original capital contributions to them since you would still make out exceedingly well with this venture.

"I hope that you will revisit your decision concerning this matter with the foregoing in mind." (Emphasis added.)

On August 28, 1990, Schoff and twenty-five other limited partners of Complexicable filed a complaint in the Cuyahoga County Court of Common Pleas against appellants. The complaint alleged that appellants had done the following:

"made a distribution based upon a One Hundred percent (100%) return of original capital contribution, rather than the One Hundred Fifty percent (150%) return of capital contribution as specified in the partnership agreement [and, further, that] [a]s a direct and proximate result of this distribution effected by the general partners, in contravention of the partnership agreement, the plaintiffs and all Class A limited partners of the partnership received Six Thousand Dollars ($6,000.00) less per Class A limited partnership unit, than would have been received had the formula in the partnership agreement been followed."

The complaint therefore alleged the following causes of action against appellants, *viz.*, breach of contract, breach of fiduciary duty, and conversion. Plaintiffs also sought an accounting of Complexicable's assets.

On January 9, 1991,[2] appellants filed an answer, counterclaim, and a third-party complaint against Diversified Equities, Diversified Equities Securities Corporation,[3] and appellee. In relevant part, appellants alleged in their third-party complaint the following:

"13. In all of the *drafts* of the Amended and Restated Agreement and Certificate of Limited Partnership, ARTICLE IV, Section 4.1(b)(i) provided:

"each Partner shall be allocated the *amount of gain needed,* if any, to increase his capital account *to an amount equal to his total capital contributions* actually made to the Partnership * * *;

"14. In the final version of the Amended and Restated Agreement and Certificate of Limited Partnership, ARTICLE IV, Section 4.1(B)(i) [*sic* ] provided:

"each Partner shall be allocated the *amount of gain needed,* if any, to increase his capital account *to an amount equal to 150% of his total capital contributions* actually made to the Partnership * * *;

"15. TH & F [appellee] made the change reflected above in the final version of Article IV, Section 4.1(B)(1) [*sic* ] of the partnership agreement.

"16. *Such change in the partnership agreement was made by TH & F* without any instruction or authority from Complexicable and/or the General Partners." (Emphasis added.)

Appellants therefore alleged against appellee the following causes of action, *viz.* (1) "breach of the agreement * * * in which [appellee] agreed to perform legal services for the [appellants]"; (2) breach of duty which "constitutes negligence and proximately caused damage to [appellants]"; and (3) "conflict of interest" which caused appellee to act in favor of the other third-party defendants.

Appellee filed an answer denying the material allegations of appellants' third-party complaint. Appellee also asserted several affirmative defenses, including the defense that appellants' claims against appellee, all of which sounded in malpractice, were barred by the applicable statute of limitations.

---

**2.** On February 12, 1991, appellants filed an amended third-party complaint. Except for the addition of Complexicable as a new-party defendant and third-party plaintiff, the amended pleading was the same as the initial pleading.

**3.** This entity acted as the original sales agent for Complexicable partnership units.

On August 30, 1991, following some discovery, appellee filed a motion for summary judgment. Appellee argued in the brief in support of its motion that since appellants' claims were claims of malpractice, appellants' claims were untimely filed pursuant to R.C. 2305.11(A).

In its brief in support of the motion for summary judgment, appellee stated its representation of appellants terminated by March 1984. Appellee also stated that a "cognizable event" had occurred in October 1988, whereby appellants discovered they had been injured and were on notice of a need to pursue possible remedies. Appellee concluded that since appellants' third-party complaint was not filed until January 9, 1991, pursuant to R.C. 2305.11, appellants' legal malpractice claims were barred by the one-year statute of limitations. Appellee therefore asserted that no genuine issue of material fact existed as to appellants' claims against it and it was entitled to judgment as a matter of law.

Attached as exhibits to appellee's motion for summary judgment were the following: (1) the affidavit of James Schoff; (2) the affidavit of appellee's employee, attorney Donald Messinger; (3) a copy of the Complexicable partnership agreement filed December 30, 1983 in the office of the Cuyahoga County Recorder; and (4) a copy of the October 25, 1988 letter from Schoff to appellant McGill.

Contemporaneously with the filing of its motion for summary judgment, appellee filed in the trial court the deposition taken as if on cross-examination of appellant McGill.

Appellants filed a brief in opposition to appellee's motion for summary judgment without any evidentiary material attached thereto.

In their brief in opposition, appellants did not dispute their claims against appellee were claims of legal malpractice. Appellants simply asserted a question of material fact remained concerning what was the "cognizable event" for purposes of R.C. 2305.11(A).

On May 4, 1992, the trial court granted appellee's motion for summary judgment. In its judgment entry of opinion, the trial court stated in pertinent part the following:

"For the following reasons, this Court finds that third-party defendant's motion for summary judgment should be granted.

" * * *

"Thompson, Hine & Flory drafted numerous versions of the partnership agreement. McGill and TCI allege that after the last draft of the partnership agreement was prepared, Thompson, Hine & Flory changed ARTICLE IV, Section 4.1(b)(i) without the knowledge or authority of McGill or TCI.

"* * * *

"In October of 1988, plaintiff Schoff, a limited partner, began to dispute the distribution percentages of the payout in a letter to McGill and TCI which questioned the one hundred percent (100%) return of the original capital contributions as opposed to the one hundred and fifty percent (150%) return provided for in the partnership agreement prepared by Thompson, Hine and Flory. In August of 1990, the limited partners, Peter Spencer, et al., filed the instant complaint seeking to enforce the one hundred and fifty percent (150%) payout provision. In January of 1991, the third-party complaint was filed in this action by McGill and TCI against Thompson, Hine & Flory.

"Thompson, Hine & Flory argues that the claim for legal malpractice brought by McGill and TCI is barred by R.C. § 2305.11(A), the statute of limitations for legal malpractice.

"It is Thompson, Hine & Flory's position that the statute of limitations began to accrue either in 1984 when all work was completed on the cable television partnership agreement, or in October, 1988 when McGill and TCI became aware of the existence of the one hundred and fifty percent (150%) payout provision. In either instance, more than one year would have elapsed prior to filing the third-party complaint.

"McGill and TCI argue they did not become aware of their alleged injuries resulting from Thompson, Hine & Flory's conduct until plaintiffs, Peter Spencer, et al., filed their complaint against McGill and TCI in August of 1990 and that is when the statute of limitations should begin to run. In the alternative, McGill and TCI argue that the question of whether McGill and TCI should have discovered their injuries at an earlier date raises a question of fact to be resolved by a jury.

"* * * *

"Upon review of the record in this action, this court finds * * * the cognizable event occurred in October of 1988 when plaintiff Schoff began to dispute with McGill and TCI the general partners' one hundred percent (100%) distribution to the limited partners as opposed to the one hundred fifty percent (150%) distribution provided for in the final version of the Partnership Agreement. * * * The third-party complaint filed twenty-seven months later is beyond the bar of the statute of limitations.

"No genuine issue of material fact exists, third-party plaintiffs' action for legal malpractice is barred by R.C. § 2305.11(A), and third-party defendant Thompson, Hine & Flory is entitled to judgment as a matter of law."

On June 4, 1992, appellee filed a motion in the trial court for an order pursuant to Civ.R. 54(B) seeking finality in the trial court's order granting appellee's

motion for summary judgment. On July 17, 1992, the trial court granted appellee's motion for an order pursuant to Civ.R. 54(B) noting "the court finds there is no just cause for delay."

Appellants thereafter filed a timely appeal. Appellants present two interrelated assignments of error which may be addressed together as follows:

"I. It was error for the trial court to grant third-party defendant Thompson, Hine & Flory's motion for summary judgment because, as a matter of law, the third-party complaint against Thompson, Hine & Flory was filed within the one-year statute of limitations applicable to causes of action for legal malpractice.

"II. It was error for the trial court to grant third-party defendant Thompson, Hine & Flory's motion for summary judgment because there are material questions of fact in dispute regarding when defendants and third-party plaintiffs, John W. McGill, Telecommunications, Inc., and Complexicable of Brecksville discovered or should have discovered their injuries resulting from Thompson, Hine & Flory's misconduct."

These assignments of error lack merit.

Appellants argue the trial court erred in granting appellee's motion for summary judgment on two grounds, *viz.* (1) appellants were not "injured" by appellee's actions until the limited partners filed a complaint against them and therefore their cause of action against appellee did not accrue until August 1990; and (2) reasonable minds could differ as to whether a "cognizable event" occurred in October 1988, to put appellants on notice to pursue their remedies against appellee. Appellants' argument is unpersuasive.

Civ.R. 56 states in pertinent part as follows:

"(C) Motion and Proceedings Thereon. * * * Summary judgment shall be rendered forthwith if the pleading, depositions, * * * written admissions, [and] affidavits, * * * timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor.

"* * *

"(E) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the

affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. * * * When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response,* by affidavit or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue* for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." (Emphasis added.)

The burden of establishing that material facts are not in dispute, and that no genuine issue of fact exists, is on the party moving for summary judgment. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

Appellants in the case *sub judice* do not dispute their claims against appellee were for legal malpractice. *Hibbett v. Cincinnati* (1982), 4 Ohio App.3d 128, 4 OBR 220, 446 N.E.2d 832; *Muir v. Hadler Real Estate Mgt. Co.* (1982), 4 Ohio App.3d 89, 4 OBR 170, 446 N.E.2d 820. R.C. 2305.11(A) applies to malpractice claims and states in pertinent part the following:

"(A) * * * [A]n action for malpractice other than an action upon a medical, dental, optometric, or chiropractic claim, * * * shall be commenced within one year after the cause of action accrued * * *."

Interpreting this statute with respect to legal malpractice claims, the Ohio Supreme Court has recently stated as follows:

"In *Skidmore & Hall v. Rottman* (1983), 5 Ohio St.3d 210, 5 OBR 453, 450 N.E.2d 684, syllabus, * * * [t]his court held that under R.C. 2305.11(A), a cause of action for legal malpractice accrues and the statute of limitations begins to run *when the client discovers, or, in the exercise of reasonable care and diligence should have discovered the resulting injury.*

"This court, in *Hershberger v. Akron City Hosp.* (1987), 34 Ohio St.3d 1, 516 N.E.2d 204, * * * adopted an approach that requires an inquiry into the particular facts of the action and the following determinations: *when* the injured party *became aware* of, *or should have become aware* of, the extent and seriousness of his condition; whether the injured party *was aware, or should have been aware,* that such condition was related to a specific professional medical service previously rendered him; and whether *such condition would put a reasonable person on notice* of the need for future inquiry as to the cause of such condition.

"Recently, in *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941, paragraph two of the syllabus, *this court adopted the Hershberger factors for determining the accrual date in a legal malpractice action.*

Furthermore, in paragraph one of the syllabus of *Omni–Food,* this court applied the 'termination rule' to legal malpractice actions and held that a cause of action accrues in a legal malpractice action under R.C. 2305.11(A) *when the attorney-client relationship for that particular transaction* or *undertaking terminates* [emphasis in original] *or when the client discovers the resulting damage or injury, whichever occurs later.*

"The 'extent and seriousness of his condition' language in *Hershberger* was further explained by us in *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 538 N.E.2d 93. In *Allenius,* we found that a patient *becomes or should become aware of the extent and seriousness of his injury when there is a 'cognizable event'* which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and *where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies.*

"We are of the opinion that the same justifications set forth in *Allenius* for determining the date of discovery in a medical malpractice action are equally compelling in the legal malpractice context. *Medical and legal malpractice actions should conform to the same standard for determining when a cause of action accrues and when the statute of limitations commences.*

"* * *

"In *Allenius,* we stated that we did not believe that an injured person must be aware of the full extent of the injury before there is a cognizable event. Instead, *it is enough that some noteworthy event, the cognizable event, has occurred which does or should alert a reasonable person that an improper* medical *procedure,* treatment or diagnosis *has taken place.*" (Emphasis added.) *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 57–58, 538 N.E.2d 398, 401–402. See, also, *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941.

In ruling on appellee's motion for summary judgment, the trial court had before it only appellee's evidence. Appellants merely rested on the allegations of their pleading. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095. The affidavit of Donald Messinger, the attorney who worked with appellants concerning Complexicable matters, stated appellee's representation of appellants ceased after March 1984. This statement was undisputed.

Moreover, in his affidavit, Schoff stated he began to dispute appellants' interpretation of the payout provision in October 1988. Schoff's statement was supported by an exhibit, *viz.,* the letter from Schoff to appellant McGill. In his letter, Schoff indicated the amount of money involved in the dispute was *at least $210,000.*

Furthermore, in his deposition taken as if on cross-examination, McGill stated the following:

"Q. So with respect to the syndication of Complexicable of Brecksville, is it fair to say that Thompson, Hine and Flory's legal role was complete at around the end of 1983 or slightly thereafter?

" * * *

"A. We always felt that Thompson, Hine was our legal adviser at Complexicable of Brecksville and that would be a continuing relationship, so I wouldn't say that it was complete.

"Q. But *you don't recall any specific legal services performed after the syndication was completed and the closing took place at the end of 1983, correct?*

"A. At this time *I don't recall any specific legal services* that were rendered.

"Q. There came a time, did there not, when a dispute arose, or some disagreement arose concerning the proper amount to distribute to the limited partners upon the sale of the assets of Complexicable of Brecksville, correct?

"A. Yes.

"Q. * * * Plaintiffs' Exhibit E, *a February 15th, 1989 letter from yourself, sir, to James Schoff,* and I have handed you a clean copy of that exhibit. Let me ask you to just refresh your memory by reading that letter, please.

"A. Yes.

"Q. Is that a copy of a letter that you sent to Mr. Schoff?

"A. Yes.

"Q. Did you send this letter at or around February 15, 1989?

"A. I believe so, yes.

"Q. In this letter you describe *the discovery that the partnership agreement filed with the County Recorder for Complexicable of Brecksville provided for a 150 percent priority payout* to the limited partners when the assets of Complexicable of Brecksville were sold, right?

" * * *

"A. I believe that's what the letter indicates, yes.

"Q. And in the third full paragraph of that letter, in the fifth line of that paragraph, you write 'Our financial people did not *notice this change until September of 1988 when we were preparing to make the final distributions.*' Do you see where I'm reading, sir?

"A. Yes, ma'am.

"Q. Is that a correct statement?

"A. Yes." (Emphasis added.)

■ Thus, a review of the record in the case *sub judice* reveals that appellants had discovered and were fully cognizant of the "injury" caused by appellee's alleged malpractice by September 1988. Although appellants argue they were not actually "injured" until the limited partners filed the complaint against them on August 28, 1990, this places an overly restrictive interpretation on R.C. 2305.11(A) which the case law does not support. "Injury" is not defined monetarily; rather, it is defined in terms of notice. Whether there was an "injury" depends upon whether an event has occurred "which does or should alert a reasonable person" that appellee committed an improper act in its legal representation of appellants. See, *e.g., Torok v. Torok* (Jan. 22, 1987), Cuyahoga App. No. 51611, unreported, 1987 WL 5653.

Certainly by September 1988, or at the latest by October 1988, appellants were put on notice of the extent and seriousness of the difference between their interpretation of the payout provision and the interpretation of the limited partners. As Schoff stated in his letter to appellant McGill, the difference was in the amount of at least $210,000.

Appellants were therefore aware by October 1988, that if they distributed the "payout" according to their interpretation rather than under the express terms of the partnership agreement, they would be liable for the monetary difference. It is thus reasonable to assert appellants were by then on notice of an "injury" allegedly caused by appellee's improper drafting of the partnership agreement.

Construing the evidence in the case *sub judice* most strongly in appellants' favor, reasonable minds could only conclude appellants knew of the injury allegedly caused by appellee in September 1988. Furthermore, as Schoff's letter of October 1988 indicated, a comparison of the two "versions" of the payout provision put appellants on notice of the extent and seriousness of the alleged malpractice.

■ The statute requires an action for malpractice be brought within one year after the causes of action accrues. Under *Zimmie v. Calfee, Halter & Griswold, supra,* the cause of action accrues when there is a "cognizable event" which should alert a reasonable person that in the course of legal representation his attorney committed an improper act. Such a cognizable event occurred in the case *sub judice* in September and/or October 1988, when appellants became aware of the following: (1) the duly filed partnership agreement which contained a one-hundred-fifty-percent payout provision; and (2) Schoff, as a limited partner, sought to enforce the one-hundred-fifty-percent payout provision. Appellants' third-party complaint, however, was not filed until January 1991, approximately

one year and two months after the one-year statute of limitations for legal malpractice had expired.

Since the third-party complaint was untimely filed pursuant to R.C. 2305.11(A) and *Zimmie v. Calfee, Halter & Griswold, supra,* there remained no genuine issues of material fact in the case *sub judice.* Therefore, the trial court did not err in granting appellee's Civ.R. 56 motion for summary judgment. *Barna v. Joseph* (June 22, 1989), Cuyahoga App. No. 56806, unreported, 1989 WL 70007.

Accordingly, appellants' assignments of error are overruled.

*Judgment affirmed.*

PATTON, P.J., KRUPANSKY and PORTER, JJ., concur.