DECISION
Plaintiff-appellant, Naomil Endicott, appeals from a decision of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Michael J. Johrendt and the law firm of Johrendt, Cook Eberhart. The present action arises out of appellees' legal representation of appellant in a lawsuit brought by appellant against her former employer, World Harvest Church.
Appellant engaged attorney Donald Hallowes and the firm of Welch, Hallowes Miller Co., L.P.A., in 1992, to represent her in her employment action. Hallowes later engaged appellees as co-counsel. Hallowes and Johrendt obtained a settlement offer from the church and presented it to appellant, who rejected it as inadequate. The difference of opinion between appellant and her counsel over the value of the employment case eventually led to a termination of appellees' representation of appellant, and appellant engaged attorney Clifford O. Arnebeck, Jr., her counsel in the present malpractice action, to represent her in the employment action. In April 1995, attorney Arnebeck negotiated a settlement of the employment action against the church at a figure markedly higher than that which appellee Johrendt had advised appellant to accept in 1993.
Appellant subsequently filed the present malpractice action against Johrendt, Hallowes, and their respective firms in late 1996. The original complaint couched her malpractice claims as stemming from breach of contract, breach of fiduciary duty, and intentional infliction of emotional distress. Appellant filed an amended complaint almost immediately thereafter, re- labeling her claims as breach of contract by fraud, breach of fiduciary duty by fraud, and intentional infliction of emotional distress. Appellant voluntarily dismissed this initial malpractice action without prejudice on June 25, 1997.
On October 27, 1997, appellant re-filed her malpractice action with the new complaint expressly alleging a legal malpractice claim, as well as claims for misrepresentation, breach of contract by fraud, breach of fiduciary duty by fraud, and intentional infliction of mental distress. This re-filed complaint, which forms the basis for the present action, reprised the allegations of prior complaints that appellees had failed to make a reasonable effort to obtain a satisfactory settlement or verdict in appellant's employment action against the church, that appellees had attempted to coerce or influence appellant into accepting a lower settlement than she deserved or desired, and that appellees had further pressured her to accept a lower settlement by withdrawing as counsel a few weeks before the Cscheduled trial in November 1993. The re-filed complaint additionally alleged that appellees acted as co-counsel in June 1993 with the law firm of Chester, Hoffman, Willcox Saxbe in an unrelated matter for an unrelated client, which created a conflict of interest in appellant's case because the Chester firm had entered an appearance as counsel on behalf of the defendant-employer in May 1993.
In a related action, appellant, attorney Arnebeck, and appellees have been engaged in parallel arbitration proceedings concerning division of the attorney fees from appellant's settlement with her former employer. Pursuant to the arbitration provisions of appellant's contingent fee agreement with Hallowes and appellees, appellees sought a share of the contingent fees payable to Arnebeck from the settlement on the basis that they were entitled to reasonable attorney fees for services provided up to the date of their termination of representation by appellant. The primary issue in the arbitration proceeding was whether appellees and Hallowes had voluntarily withdrawn as appellant's counsel in the employment action, or whether they had been constructively discharged by appellant.
The panel of three arbitrators heard testimony over two days from appellant, Arnebeck, Johrendt and Hallowes. The gist of Johrendt and Hallowes' testimony at the hearing was that they were compelled to withdraw as appellant's counsel in the employment action because they felt that appellant was impaired by medication and was in no condition to make objective decisions regarding the case, or to be an effective witness at trial. Former counsel further testified that appellant had refused to follow their advice to get help from a treating psychologist, and that appellant appeared to be motivated more by a desire to drag her former church employer through trial and the resultant bad publicity, and was also preoccupied by a desire to obtain revenge against members of her family involved in church administration, and by the possibility of obtaining a lucrative book deal about her experiences.
Appellant, in contrast, testified before the arbitration panel that Hallowes and Johrendt recommended that she settle her action for an unacceptably low amount, and that when she would not consent to do so, they withdrew from representation shortly before the November 15, 1993 trial date.
The arbitration panel, in its decision, found that "there was a constructive discharge of attorneys Johrendt and Hallowes by their client, Naomil Endicott, and that they are entitled to their quantum meruit fees plus expenses. * * * From the contingency fees, there shall be a payment from Mr. Arnebeck to Mssrs. Johrendt and Hallowes in the amount of $36,500.* * *" That finding by the arbitration panel was initially reversed by the court of common pleas, but subsequently reinstated by this court.Endicott v. Johrendt (Apr. 30, 1998), Franklin App. No. 97AP-1122, unreported.
In the present action, appellees filed a motion for summary judgment, arguing that because appellant had voluntarily settled her underlying employment claims for a figure well in excess of any amount offered by the church during the period of appellees' representation, she could not show that she suffered damages from any of the alleged acts of malpractice or misconduct by appellees. The trial court relied upon Muir v. Hadler RealEstate Mgmt. Co. (1982), 4 Ohio App.3d 89, 90, for the proposition that all counts of the complaint should be treated as arising from, and merging with, the alleged legal malpractice. Treating the action as one for malpractice only, the trial court ruled that appellant's claimed damages, in light of the settlement which she had reached in the employment case, were too speculative to sustain. The court further found that appellant had failed to submit evidence that the delay in the case caused by appellees' withdrawal from representation had caused her any damages. The trial court therefore granted summary judgment for all defendants. Hallowes and his firm were later voluntarily dismissed and are not parties to this appeal.[1] Appellant has timely appealed and brings the following assignments of error:
 1. The trial court, citing Muir v. Hadler Real Estate Mgmt. Co. (1982), 4 Ohio App.3d 89, 446 N.E.2d 820, erroneously treated all counts of plaintiff's complaint (legal malpractice, misrepresentation, fraudulent breach of contract, fraudulent breach of fiduciary duty and intentional infliction of emotional distress) as being, in substance, for legal malpractice, whereas plaintiff met her pleading and evidentiary burden under this court's holding in DiPaolo v. DeVictor (1988), 51 Ohio App.3d 166, 555 N.E.2d 969 for complaints of fraudulent conduct by an attorney.
 2. The trial court, citing Sawchyn v. Westerhaus (1991), 72 Ohio App.3d 25, erroneously ruled that, because Endicott had settled her underlying tort claims, as to which defendants had formerly represented her, her damages from defendants' malpractice and/or misconduct in representing her were inextricably intertwined with the settlement and, therefore, could not be proven.
 3. The trial court erred in concluding that plaintiff had presented no evidence of damage to her as a direct and proximate result of the misconduct of defendants because, based upon the Ohio Supreme Court's holding in Vahila v. Hall (1997), 674 N.E.2d 1164, 77 Ohio St.3d 421, plaintiff's loss of opportunity and delay, as to which she presented ample evidence as having been proximately caused by defendants' misconduct, is sufficient to meet plaintiff's burden as to malpractice and misconduct.
 4. The trial court erred by inferring that the delay produced by defendants' misconduct did not damage plaintiff because she later obtained more in settlement after she obtained other counsel, because plaintiff, as the nonmoving party, is entitled pursuant to Civ.R. 56(C) to the inference that, had defendants not mistreated plaintiff, she could have obtained a more favorable settlement or verdict at an earlier time.
The present case was decided on summary judgment. Pursuant to Civ.R. 56(C), a motion for summary judgment will be granted if no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and the evidence demonstrates that reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party. Bostic v. Connor (1988), 37 Ohio St.3d 144; Davis v.Loopco Industries, Inc. (1993), 66 Ohio St.3d 64. Upon appeal from a grant of summary judgment by the trial court, an appellate court will de novo review the pleadings and evidentiary material submitted to the trial court and apply the same standard to determine whether the materials submitted establish a genuine issue of material fact. Lorain Natl. Bank v. Saratoga Apts.
(1989), 61 Ohio App.3d 127, 129. The appellate court will review the grant of summary judgment independently and will not defer to the trial court. Midwest Specialties, Inc. v. Firestone Tire Rubber Co. (1988), 42 Ohio App.3d 6. Summary judgment will be granted where the non-moving party fails to produce evidence on any issue for which that party bears the burden of production at trial. Wing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108, paragraph three of the syllabus; State ex rel. Morley v.Lordi (1995), 72 Ohio St.3d 510, 513. Where a motion for summary judgment has been made and supported as provided in Civ.R. 56, a non-moving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing that there is a genuine triable issue. Jackson v. Alert Fire Safety Equip.,Inc. (1991), 58 Ohio St.3d 48, 52. However, a moving party cannot discharge its burden under Civ.R. 56 simply by making conclusory assertions that the non-moving party has no evidence to prove its case. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. Rather, the moving party must point to some evidence that affirmatively demonstrates that the non-moving party has no evidence to support his or her claims. Id.
Appellant's first assignment of error asserts that the trial court improperly treated all counts enumerated in appellant's complaint as representing, in substance, components of a single cause of action for legal malpractice. In Muir, supra, at 90, this court stated: "[A]n action against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice within the meaning of R.C. 2305.11, regardless of whether predicated upon contract or tort or whether for indemnification or direct damages." Our opinion in Muir went on to state, "malpractice by any other name still constitutes malpractice." Id.
This language in Muir, as well as in a multitude of cases which address the same issue, is prompted by frequent attempts by defendants in malpractice actions to avoid the one-year statute of limitations on such actions, and benefit from the longer statutes of limitations applicable to alternative theories of recovery. "The applicable statute of limitations is determined not from the form of the pleading or procedure, but from the gist of the complaint." Hibbett v. Cincinnati (1982), 4 Ohio App.3d 128, 131
(treating fraud and various other claims in a complaint as a single legal malpractice claim.) In fact, appellees argue in this appeal, that summary judgment was not only appropriate on the grounds cited by the trial court, but that appellant's claims were all time-barred as well. Since the trial court did not rely upon the statute of limitations in rendering summary judgment, and our disposition of appellant's assignments of error make it unnecessary to reach issues not passed upon by the trial court, we will consider the question of which causes of action were properly pled only to establish the gist of appellant's claims in order to determine whether appellant has sustained her evidentiary burden in opposing summary judgment.
Appellant's complaint in the present matter contained a claim for legal malpractice and four additional claims for misrepresentation, breach of contract by fraud, breach of fiduciary duty by fraud, and intentional infliction of mental distress. The misrepresentation claim is based upon allegations that Johrendt deliberately mislead appellant about his willingness to go to trial in the employment action, and failed to disclose actual or potential conflicts of interest arising out of a concurrent co-counsel relationship with opposing counsel in the employment case. We agree with the trial court that this misrepresentation claim is part and parcel of the malpractice action, and should be subsumed thereto. "[A]llegations of fraudulent misrepresentation * * * do not transmute or change the cause of action from one in malpractice to one in deceit."Swankowski v. Diethelm (1953), 98 Ohio App. 271, 275 (addressing medical malpractice claim, but often cited with approval in legal malpractice cases: Strock v. Pressnell (1988), 38 Ohio St.3d 207; Ward v. Lynch (Dec. 7, 1995), Cuyahoga App. No. 68554, unreported.) Similarly, appellant's breach of contract and breach of fiduciary duty claims, viewed independently of the "fraud" component appended thereto in the complaint, clearly "arise out of the manner in which [appellant] was represented within the attorney/client relationship," Spencer v. McGill (1993),87 Ohio App.3d 267, 275, and are subsumed into the malpractice claim.
As to the fraud component of appellant's claims, we agree with appellant that this court has recognized that not all fraudulent conduct will always be brought back under the umbrella of a general malpractice claim. In DiPaolo v. DeVictor (1988),51 Ohio App.3d 166, we addressed facts in which plaintiffs alleged that the defendant attorneys had made fraudulent statements during the course of their representation. We noted the presumption that attorneys act in good faith in handling their client's affairs:
 In order to rebut that presumption and sufficiently allege a cause of action for fraud against attorneys in a situation where the gist of the complaint involves legal malpractice * * * plaintiffs must have specifically alleged that defendants committed the actions for their own personal gain. To hold otherwise would be to undermine the purpose and focus of the malpractice statute. Moreover, such [a] requirement is in keeping with the particularity generally necessary to have a well pleaded complaint in fraud. Id. at 173.
Appellant seeks to have the present matter fall within the exception stated in DiPaolo by pointing out that appellees' alleged fraudulent statements were made in furtherance of their desire to, firstly, obtain a settlement in the employment action (and resulting contingent fee) with as little effort and delay as possible, and secondly, to maintain a financially rewarding co-counsel relationship in an unrelated case with the Chester firm, opposing counsel in the employment action. We do not find that this is the type of personal profit contemplated when this court stated the exception set forth in DiPaolo, and accordingly find that appellant's claim for fraud may not be maintained separately from the underlying malpractice action.
As to appellant's claim for intentional infliction of mental distress, however, we reach a different outcome. Appellant's complaint alleges that appellees sought to exploit appellant's distress arising from her personal circumstances and the underlying employment action, for the purpose of compelling appellant to grant them authority to settle the case for a figure considerably below what she initially would accept. Appellant further alleges that, after she settled the employment case with her new counsel, appellees sought to pressure her into agreeing to pay them legal fees by interfering with the consummation of the settlement and by falsely characterizing her as an abuser of prescription drugs. Appellant alleges that she suffered extreme mental and physical distress as a direct result of these actions by appellees, including nausea, vomiting, severe headaches, and depression.
The component of appellant's intentional infliction of mental distress claim which alleges that appellees exerted undue pressure upon her to settle her employment action clearly falls within the ambit of their representation of her in that case, and will be considered under the discussion of that malpractice claim generally. The second component of her intentional infliction of mental distress claim, however, is based upon actions and statements by appellees occurring well after their representation terminated, in connection with the arbitration proceeding undertaken to allocate fees from appellant's settlement with her former employer. This component of the claim clearly differs from the other aspects of appellant's complaint in that its factual allegations cover matters not necessarily within the scope of legal representation of appellant by appellees (although devolving therefrom), and in that it asserts damages in the form of physical injury which differ from the pecuniary damages resulting from the delay in settlement which appellant claims resulted from appellees' withdrawal of representation in the employment action. As such, we find that appellant's intentional infliction of mental distress claim does not fall entirely within the scope of Muir,
and, unlike the balance of her complaint, constitutes a separate claim from the legal malpractice action.
Nonetheless, although we find that the trial court erroneously assimilated certain aspects of appellant's intentional infliction of mental distress claim with the legal malpractice aspect of the complaint, we find that the trial court did not err in granting summary judgment for appellees on this claim as well, because appellant has not sustained her burden of presenting evidence creating a material issue of fact on issues for which appellant bears the burden of presenting evidence at trial. The tort of intentional infliction of mental distress, more commonly referred to as intentional infliction of emotional distress, has been defined in Ohio as requiring the following elements:
 (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it. * * * Serious emotional distress requires an emotional injury which is both severe and debilitating.
Burkes v. Stidham (1995), 107 Ohio App.3d 363, 375. In addressing this tort, the Supreme Court of Ohio has relied upon the description of extreme and outrageous conduct found in the Restatement:
 * * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
 Yeager v. Loc. Union 20 (1983), 6 Ohio St.3d 369,374-375, quoting Restatement of the Law 2d, Torts (1965) 71, Section 46.
In attempting to establish the conduct of appellees which amounted to such tort, the affidavit of appellant stated as follows:
 25. On April 17, 1995 we filed a motion for release of the Johrendt/Hallowes notice of lien so I could receive my settlement. Former counsel Johrendt and Hallowes opposed my motion. In the course of a hearing on that matter Johrendt accused me of having been an abuser of drugs and irrational, among other things. Johrendt's characterization of me was similar to the attack the defendants had made upon me and that they typically make against anyone who leaves the World Harvest Church after suffering abuse by them. While no record was made of this hearing, Mr. Johrendt's attack on me was similar to that he made on me at the arbitration hearing before the OSBA attached hereto as Exh. 6.
 26. I suffered vomiting, depression, weight loss and extreme emotional distress as a result of this effort to sabotage my enjoyment of my settlement.
* * *
 30. In the time preceding their motion to withdraw Mr. Johrendt and Hallowes did nothing but try to show I was a drug addict. They did nothing to show that there was no drug problem.
 31. During 1993 I was coherent, rational, and felt confident regarding my case and representation except for the disagreement over the amount of settlement.
 32. At no time in my life have I abused drugs. At no time while meeting with either Mr. Johrendt or Mr. Hallowes was I under the influence of drugs.
 33. In 1993 I was seeing only one doctor, namely Doctor Pangalangan, a gynecologist. Dr. Pangalangan prescribed only a hormone Premarin and twice prescribed Tylenol 3 for severe headaches.
The pertinent sections of the arbitration hearing referred to in the affidavit contained testimony by Johrendt as follows:[2]
 We became concerned because the communications became strained and because her condition and her dealings with us became strained. I talked to Don about this. I had met with her; I'd talked to her on the phone. I said, "Don, why don't you talk to her and see what the problem is and what you can do." Don talked to her and didn't seem to be much help. We frankly thought And Don, I think, will give you his view of it. We frankly thought that she was overmedicated and operating under a great deal of stress.
* * *
 We were very, I think, polite and diplomatic with her in the sense we didn't accuse her of abusing drugs, but what we said to her was, "You need to understand defense counsel is going to raise these things; this is what they're focusing on in discovery; they're going to bring this up." Frankly, she wasn't able to hold up in terms of a meeting with her own lawyers for an hour, hour-and-a-half, much less — that's kind of the explanation that we were giving her — much less stand a week or two in trial and be in court. I think she just really had a hard time with some of the baggage with the case.
 She lost her home. I shouldn't say her home. She didn't have a home. She was living with a lady in a basement and was commiserating with us from time to time, and just had problems with her living arrangements, had problems with her health and her treatment, her overmedication.
 After we started the case, she'd been arrested twice more for shoplifting and we were getting to the point where we had a client who was out of control. Don and I spoke and thought what do we do with her.
 We called Bruce Campbell at the Bar Association and described the background to him and asked him what thoughts he had, and he sent us some literature that they had on dealing with incapacitated clients. We read that and looked at it. We considered going to the administrative judge for the Common Pleas Court. No, we don't want to do that, that may get back to the other side, and we don't want to let anything happen that would disclose, you know, confidences and something of the case. We had to maintain the integrity of that.
* * *
 We thought, she's got a good case. We can't let the client harm herself. We've got to do something to — She won't seek help. We've got to do something to get out of the situation in terms of going head long into a buzz saw of a trial here in two weeks, and so we thought, the smoothest thing — We considered going to the administrative judge. We thought the smoothest thing was to file an innocuous motion to withdraw, that would buy her time, she could get new counsel, she could get the continuation, or maybe she could come to her senses. (Tr. 44, 45-46, 49.)
We find that the above-quoted statements by Johrendt do not demonstrate that he "either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff," Burkes,supra, the first element of the tort of intentional infliction of emotional distress. Nor do we find that the statements are "so extreme and outrageous as to go beyond all possible bounds of decency," under the second element of the tort. We base this conclusion both on the content of Johrendt's remarks themselves, and the forum in which they were uttered: a confidential arbitration proceeding, before a limited audience comprised of interested parties and factfinders, in which an attorney was attempting to describe, in rather restrained terms, difficulties he experienced with a client. Taking as true, for purposes of summary judgment, appellant's statements regarding the inaccuracy of Johrendt's description of her prescription drug use or mental state, there still remains no issue of material fact regarding the existence of sufficiently extreme conduct on the part of appellees to support a claim of intentional infliction of mental distress.
Based upon the forgoing, we find that with the exception of appellant's intentional infliction of mental distress claim, the trial court did not err in incorporating all of appellant's various claims into the legal malpractice claim. We further find that appellant's intentional infliction of mental distress claim was nonetheless subject to summary judgment, even if considered separately. Appellant's first assignment of error is accordingly overruled.
We now turn to appellant's three remaining assignments of error, which present interrelated issues regarding the existence of damages in the case and will be addressed together. To establish a cause of action for legal malpractice, appellant must show: (1) an attorney-client relationship giving rise to a duty; (2) breach of that duty; and (3) resulting damages caused by the breach. Krahn v. Kinney (1989), 43 Ohio St.3d 103. The trial court, in granting summary judgment for appellees, found that, even accepting arguendo, that appellees had breached the standard of care in their representation of appellant, appellant's later settlement of her employment action rendered any damages purely speculative. The trial court further noted that appellant had produced no evidence of damages at all.
We agree with appellant that, of itself, subsequent settlement of the underlying action is not always preclusive of damages in a malpractice case. Vahila v. Hall (1997), 77 Ohio St.3d 421; Monastra v. D'Amore (1996), 111 Ohio App.3d 296; Gibsonv. Westfall (Oct. 7, 1999), Cuyahoga App. No. 74628, unreported. But, see, Sawchyn v. Westerhaus (1991), 72 Ohio App.3d 25; Estateof Callahan v. Allen (1994), 97 Ohio App.3d 749.
It is unnecessary in the present case, however, to determine whether the settlement itself precluded any showing of damages, because on the present facts, appellant has not shown that she was damaged by appellees' withdrawal as counsel. "Before legal malpractice can occur, the client must have incurred damages that were directly and proximately caused by the attorney's malpractice." Northwestern Life Ins. Co. v. Rogers (1989),61 Ohio App.3d 506, 512. It is axiomatic that compensatory damages must be shown with certainty, and damages which are merely speculative will not give rise to recovery. Swartz v. Steele (1974), 42 Ohio App.2d 1; Ratliff v. Colasurd (Apr. 27, 1999), Franklin App. No. 98AP-504, unreported. In the present case, the undisputed evidence before the trial court was that, after Johrendt had made a settlement counteroffer which was rejected by the defendant church, successor counsel presented a substantially similar offer which was again rejected. The matter was thereafter dismissed by successor counsel, and only upon re-filing some two years later was a settlement reached in an amount some two and a half times the highest offer previously presented by the church. Successor counsel, as with appellees, did not take the matter to trial even though after withdrawal of appellees as counsel a new trial date was set only two months from the original date. Appellant's response to a request for admissions was that she admitted that after appellees withdrew from representation, successor counsel was unable to secure a higher settlement offer than appellees had received. Appellant's admission also establishes that no higher settlement offer was received from the employer in 1994, and that it was not until 1995 that a substantially higher settlement offer was presented. Appellant has simply not presented any evidence beyond speculative inference that the actions of appellees during the period of representation were the cause of the lower offers presented by the church in 1993 or 1994, since successor counsel was unable to obtain a better offer, and similarly, elected not to advance the matter to trial at that time. Appellant ultimately settled her employment action for roughly two-and-a-half times the highest offer received by either counsel in the earlier phase of the case. On these facts, it is simply not possible, even viewing the evidence in a light most favorable to appellant, to establish a showing that she was damaged by any alleged acts of malpractice on the part of appellees.
We therefore find that, since appellant has not sustained her evidentiary burden in opposing summary judgment of producing evidence on any element in which she was required to prove at trial and which was challenged by appellees in the summary judgment motion, pursuant to Wing and Dresher, we find that the trial court did not err in granting summary judgment for appellees on appellant's malpractice claim. Appellant's second, third, and fourth assignments of error are accordingly overruled.
In summary, for the reasons set forth above, we find that the trial court did not err in granting summary judgment for appellees in all aspects of appellant's claim, although we find different grounds to do so with respect to appellant's claim for intentional infliction of mental distress. Appellant's first, second, third and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
BOWMAN, P.J., and BROWN, J., concur.
[1] The trial court subsequently entered a nunc pro tunc entry noting that an abuse of process counterclaim brought by appellees against Endicott was still pending before it, and appending "no just reason for delay" language pursuant to Civ.R. 54(B) to permit the present appeal to be brought without waiting for resolution of the counterclaim.
[2] There is some indication that appellant believes the transcript from which the following is excerpted to have been sealed. The record reflects no order entered by the trial court to that effect, however, Appellant has, moreover, expressly moved to supplement the record on appeal with materials that include the quoted transcript passages.